**UNITED STATES of America, Appellee,**

v.

**Richard DeVINCENT, Defendant, Appellant.**

**No. 79–1637.**

United States Court of Appeals, First Circuit.

Argued June 4, 1980.

Decided Sept. 5, 1980.

Certiorari Denied Nov. 10, 1980. See 101 S.Ct. 405.

---

Willie J. Davis, Boston, Mass., for defendant, appellant.

Peter Scheer, Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Richard D. Gregorie, Sp. Atty., Dept. of Justice, Boston, Mass., and William C. Bryson, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Appellant was convicted of making an extortionate extension of credit and of collection of an extension of credit by extortionate means in violation of 18 U.S.C. §§ 892 and 894. He assigns numerous errors on appeal, largely relating to the ad-

mission of evidence and instructions to the jury.

## I.

The testimony at trial may be summarized as follows: The government's chief witness, Allan Klein, testified that he was the owner of a "bust–out" operation–that is, it would order merchandise from suppliers using fraudulent credit references and without any intention of paying for the goods, which were then sold for whatever they would bring.

In April of 1974, while delivering some "bust–out" merchandise, Klein, a heavy gambler, met appellant, who agreed to "take all the action that [Klein] wanted to bet with him" and to extend credit to Klein for the purpose of making bets. Klein won some $3800 at first, but later in the week lost and failed to pay appellant on the day agreed to. Appellant, according to Klein, "started screaming and yelling and swearing" and ordered Klein to get the money even if he had to steal it. Appellant also threatened to shoot him "in the face" and "break both of [his] goddamn legs". Klein borrowed from another source and paid appellant.

Subsequently, Klein received a call from his cousin, Kenneth Weiner, who ran a "bust–out" operation similar to Klein's. Weiner told Klein that appellant was setting up a protection racket whereby he would get ten percent of the merchandise sold by the stores, and that he should comply because appellant "had just got out of jail for loansharking and ... he was a pretty bad guy." In August appellant came to Klein's store and accused him of "backdooring" merchandise–selling it to parties not approved by him. He then punched Klein in the face, knocking him off his chair, and left.

Klein subsequently incurred additional gambling debts, and in mid–August called one Visconti and asked to borrow $3000. Visconti agreed. When Klein arrived at Vico Sales to pick up the money, appellant was there with Visconti. Visconti told Klein, "You know I don't lend money. Vin-

nie [appellant] is the guy that lends the money." Klein testified,

"And at that time Vinnie handed me $3,000 in $100 bills and told me that Saturday was payday and he wanted $150 a week juice–and that would not come off the principal amount of the money until I could pay the whole money at one time, and I better be there every Saturday."

Klein testified that his understanding was that if he were dilatory in his payments, he would "either get beaten up or killed." He made interest payments for six to eight weeks and then paid the debt in full.

Klein's cousin, Kenneth Weiner, also testified for the government. His testimony was generally corroborative of Klein's, and covered, *inter alia*, conversations he had with Klein in which he told Klein of appellant's protection racket and warned him that appellant was "a vicious man", and in which Klein told him of his beating and threats at the hands of appellant.

Appellant produced no witnesses, and confined his case to attacking the credibility of the government's witnesses. The jury delivered a verdict of guilty.

## II.

Before proceeding to appellant's objections to the trial proceedings, we briefly review the statutory sections under which he was convicted. 18 U.S.C. § 892(a) prohibits the making of "any extortionate extension of credit". That term is defined as

"any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6).

Section 892(b) outlines (nonexclusively) the elements of a prima facie case: a legally unenforceable debt carrying an interest rate of over 45 percent; the debtor's reasonable belief that the creditor had used or

attempted to use extortionate means[1] for collection or as punishment for nonpayment, or that he had such a reputation; and a total indebtedness of over one hundred dollars. Section 892(c) allows the admission of evidence of the local reputation of the creditor's collection processes in cases where direct evidence of the debtor's belief is not available, and the government has introduced evidence of an unenforceable debt or an interest rate of over 45 per cent. Defendant's conviction under this section was based on his August, 1974, loan of $3000 to Klein.

18 U.S.C. § 894 prohibits the use of extortionate means, see n. 1, supra, to collect or punish nonpayment of any extension of credit. For the purpose of showing an implicit threat as an extortionate means, evidence may be introduced showing that the debtor knew of prior instances of collection or punishment of nonpayment by extortionate means by the creditor. Reputation evidence is admissible, under the same circumstances as in section 892(c), to show that words or other communication employed as a means of collection carried an explicit or implicit threat. Defendant was convicted under this section for his threats to Klein in connection with a June loan of $1700.

### III.

Appellant assigns as error the admission of Klein's testimony concerning the August beating and his conversations with Weiner in which the latter mentioned appellant's jail term and character, as well as Weiner's own testimony concerning his conversations with Klein. He asserts numerous grounds for exclusion, all of which we find without merit.

■ Appellant first characterizes this testimony as "reputation evidence" and ar-

gues that since there was direct evidence concerning the debtor's state of mind (i. e., Klein's statement that he thought he would be beaten or killed if he did not pay), it should not have been admitted.

The only evidence in this case which could properly be labelled reputation evidence is Weiner's statement to Klein that appellant had been in jail for loansharking and was "a pretty bad guy". This evidence, if it was indeed reputation evidence, was clearly admissible under section 892(b)(3)(B), which gives as an element of the prima facie case the debtor's reasonable belief that "the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof."

■ Appellant's protestations that this testimony was inadmissible under section 892(c) are therefore unavailing. That subsection allows evidence of the reputation, in the debtor's community, of the creditor's collection practices where direct evidence of the debtor's state of mind is unavailable. Where there is no such direct evidence the jury is asked to infer that the debtor knew of this reputation; this method of proof of the debtor's state of mind is clearly more attenuated than direct evidence that the debtor was thus informed. However, where the evidence is that the creditor's reputation was communicated to the debtor, it is admissible under section 892(b)(3)(B) without a showing of unavailability.[2] *United States v. Martorano*, 557 F.2d 1, 9–10 & n. 6 (1st Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *United States v. Bowdach*, 501 F.2d 220, 225–26 & n. 7 (5th Cir. 1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975).

1. An extortionate means is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7).

2. Section 892(c) supplements section 892(b)(3)(B) by providing for the situation

where the debtor is dead or too frightened to testify. *United States v. Bowdach*, 501 F.2d 220, 226 n. 7 (5th Cir. 1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975). It is not merely an alternative means of introducing reputation evidence, nor does it impose an additional requirement for admissibility under section 892(b)(3)(B).

Appellant also argues that because there was evidence that Klein knew of prior *instances* of appellant's extortionate credit practices (i. e., appellant's threats to him in June), there was no need to prove that he knew of defendant's *reputation* in this regard. He then goes a step further and argues that because Klein testified to his fear of bodily harm at appellant's hands, any further evidence that he knew of appellant's practices or reputation was "not necessary" and should have been excluded. He would thus confine the evidence to the debtor's bare recital that he feared the creditor might use extortionate means against him. This position is utterly without support in the statute, and we are unaware of any legal principle which would impose such a "worst evidence" rule on the government. State of mind is an elusive object of proof. All of the testimony concerning Klein's subjective understanding, his first hand knowledge of appellant's past practices, and his knowledge of appellant's reputation were highly probative of his understanding that nonpayment would be punished by extortionate means. We cannot say that any one would be sufficient to persuade a jury or that the others were a "waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.[3]

■ Appellant's characterization of this evidence as hearsay likewise must fail. Weiner's statement to Klein that appellant had been in jail for loansharking and was "a pretty bad guy" falls within a familiar category of non–hearsay; statements offered, not for their truth, but for their effect on the hearer.[4] *See* 6 Wigmore, Evidence § 1789 (Chadborn Re. 1976); McCormick, Handbook of the Law of Evidence § 249 at 589–90 (1972). The present statements were admissible for their probable effect on the debtor's understanding of the

creditor's collection practices, an essential element of the extortionate extension of credit charge.

Finally, appellant's statement that evidence of a criminal record is never admissible except to show common scheme or purpose grossly overstates the case. Such evidence is not admissible to show character or propensity. Fed.R.Evid. 404(b). "However, if such evidence is relevant to another, legitimate purpose it may be admitted if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury." *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976) and cases cited; Fed.R.Evid. 403, 404(b). Its purpose here was not to show propensity, but to show its effect on the hearer; strictly speaking, the evidence was not that appellant had been in jail, but that Klein *thought* he had been.

■ Appellant comes closer to the mark when he argues that the probative value of this testimony was outweighed by its prejudicial effect. Whenever evidence of a defendant's prior bad acts, including his criminal record, is admitted at trial there is the danger that the jury will convict, not on the evidence, but on its belief that the defendant is a man of criminal character. Where it is directed to a matter other than propensity, however, the law "does not demand *exclusion of highly probative evidence simply to prevent noisome odors about the defendant from reaching the jury's nostrils.*" *United States v. Bradwell*, 388 F.2d 619, 622 (2d Cir.), *cert. denied*, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968).

The evidence here was that Klein, having been beaten and threatened by appellant, was told that appellant had just gotten out of jail for loansharking. That this information—whether true or not—may have contributed to Klein's belief concerning appellant's

---

**3.** The trial judge is given considerable latitude in deciding when to reject relevant evidence as merely cumulative. *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). More to the point, we have not been cited to any case in which a trial court's *admission* of such evidence was held reversible error.

**4.** Fed.R.Evid. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

collection practices is obvious.[5] Congress has specifically provided for admission of evidence concerning the debtor's *reasonable* belief as to the creditor's collection practices and reputation. 18 U.S.C. §§ 892(b)(3)(A) and (B). That is precisely what was admitted here.[6] The trial judge, who is generally given considerable discretion in striking the balance between probative value and prejudicial effect, *see United States v. DeCarlo*, 458 F.2d 358, 367 (3d Cir.), *cert. denied*, 409 U.S. 843, 93 S.Ct. 107, 34 L.Ed.2d 83 (1972); McCormick, *supra*, § 185 at 441, § 190 at 453–54, accompanied the testimony with careful limiting instructions. We think the trial court did not abuse its discretion.

### IV.

Appellant also asserts that the trial court's charge to the jury on the reasonable doubt standard, reprinted in the margin,[7] was improper and unduly confusing. Defendant correctly points out that a criminal defendant may not constitutionally be convicted under any lesser standard of proof, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and that "[d]iscussion of the concept is perhaps the most important aspect of the closing instruction to the jury in a criminal trial." *Dunn v. Perrin*,

570 F.2d 21, 25 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978).

We are also aware that our latitude is somewhat greater when we are exercising our supervisory power over the district courts in this circuit than when we are limited to deciding whether a state court's instruction met minimum constitutional standards. *Cupp v. Naughten*, 414 U.S. 141, 145–46, 94 S.Ct. 396, 399, 38 L.Ed.2d 368 (1973). This does not mean, however, that we will or should reverse every time we feel we would have turned a different phrase than did the trial court. *See United States v. MacDonald*, 455 F.2d 1259, 1262–63 (1st Cir.), *cert. denied*, 406 U.S. 962, 92 S.Ct. 2073, 32 L.Ed.2d 350 (1972). We, like the Supreme Court, "accept . . . the well–established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten, supra*, 414 U.S. at 146–47, 94 S.Ct. at 400. That which, standing alone, may fall short of perfection may nonetheless be tolerable in the context of a charge which adequately instructs the jury on the standard it is to apply.[8]

■ Appellant first asserts that the trial court confused the jury in beginning his

---

**5.** Intimidation is, of course, a key element in a successful loansharking operation. In appellant's line of work, unlike many others, a criminal reputation would seem to be a valuable business asset.

**6.** If the reasonableness of a belief depends in part on its substantiation, then some evidence of prior bad acts is inevitable, even essential.

**7.** "Now, reasonable doubt. I will tell you, first, what it is not and then tell you what it is. Reasonable doubt is not doubt beyond every possibility of a doubt or beyond every conceivable doubt. it doesn't mean that the government has an obligation to prove the charge in any count to an absolute, mathematical certainty. Proof beyond a reasonable doubt does not mean proof to the degree of certainty that you all have that tomorrow morning the sun will rise again or that when you add five plus five you get ten.

Rather, it means proof to a moral certainty. It does not mean doubt in the mind of a juror who is looking for a doubt or an excuse to acquit. What it does mean is doubt in the

mind of a reasonable juror who is seeking the truth. It is doubt based on reason, as the name implies, and common sense.

Proof beyond a reasonable doubt has also been defined as signifying such proof as to satisfy your judgment, the judgment and common sense of the jury, that acting as reasonable persons and applying your reasoning to the evidence before you arrive at a conclusion that an offense as charged has been committed by the defendant, and you are so satisfied of that fact as to leave no other reasonable conclusion possible."

**8.** This is not to suggest that an instruction, *see Cupp v. Naughten, supra*, 414 U.S. at 147, 94 S.Ct. at 400; *Cool v. United States*, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), or a phrase within an instruction, *see United States v. Alverno*, 470 F.2d 981 (5th Cir. 1972), may not be so misleading as to warrant reversal. Nor do we suggest that there may not be significant room for improvement in a charge which, like the one before us, falls somewhat short of reversible error.

charge by defining what reasonable doubt is not. A definition of reasonable doubt which includes a negative formulation is not objectionable per se. *See Tsoumas v. New Hampshire,* 611 F.2d 412 (1st Cir. 1980); *United States v. Kirk,* 534 F.2d 1262, 1279 (8th Cir. 1976), *cert. denied,* 430 U.S. 906, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); *Aubut v. Maine,* 431 F.2d 688, 689 (1st Cir. 1970). Nor do we see how beginning in this way was likely to confuse a jury; surely defining something as "not A, but B" is a familiar enough idiom not to be beyond the grasp of the average juror.

■ Much of the rest of the charge was devoted to a discussion of reasonable doubt as "a doubt based on reason, as the name implies, and common sense", such that the jury "acting as reasonable persons and applying your reasoning to the evidence before you" is "so satisfied of [the defendant's guilt] as to have no other reasonable conclusion possible." Instructions which thus urge that the jury's decision should be the product of a rational thought process, while perhaps "unwisely emphatic", have been upheld in the overwhelming majority of cases. *United States v. MacDonald, supra,* 455 F.2d at 1262–63 & n. 4; *see Dunn v. Perrin, supra,* 570 F.2d at 23 & n. 2. We cannot say that the present formulation constitutes reversible error.

■ As for the court's use of "proof to a moral certainty" language, we reiterate what we have said most recently in *United States v. Indorato,* 628 F.2d 711, 721 (1st Cir. 1980). "While we discourage the 'moral certainty' phraseology, we do not regard its use as reaching the level of legal or constitutional error."

### V.

■ Appellant's other assignments of error need not detain us long. He first asserts that the prosecutor's opening was unduly argumentative and inflammatory. As we have stated, "[t]he proper function of the opening statement of the prosecutor is limited to a discussion of the evidence which he intends to introduce and believes in good faith is admissible and available." *Grimaldi v. United States,* 606 F.2d 332, 339 (1st Cir. 1979), *cert. denied,* 444 U.S. ——, 100 S.Ct. 465, 62 L.Ed.2d 386 (1980); *see United States v. D'Alora,* 585 F.2d 16, 21–22 (1st Cir. 1978); *United States v. DeRosa,* 548 F.2d 464, 469–71 (3d Cir. 1977). "It is not to poison the jury's mind against the defendant." *Government of Virgin Islands v. Turner,* 409 F.2d 102, 103 (3d Cir. 1969).

The prosecutor stayed well within these limits. Significantly, he did not comment on the beating incident or on Klein's conversations with Weiner, the evidence chiefly challenged on appeal.[9] The passage attacked by appellant as inflammatory is as follows:

"And again Mr. Klein was faced with borrowing money from Richard DeVincent. $3,000.

"What was the rate of interest? $150 a week, ladies and gentlemen.

"Now, admittedly, interest prices in this country have certainly gone up in the last few weeks, but $3,000, $150 a week is far and above the legitimate rate of interest charged in this country. And Mr. Klein paid it. He paid it and he will testify to you he paid it because he knew collateral for that loan was his life."

While the basic elements of an extortion case are presented in a somewhat colorful manner, we do not see anything here that would so "poison the minds of the jury" as to deprive appellant of a fair trial.[10]

Appellant next argues that evidence of his August beating of Klein was barred by the doctrine of collateral estoppel. Appel-

---

**9.** We need not and do not decide whether this evidence was so "questionable" as to bar its discussion in the opening, or what would be the effect of the eventual decision as to its admissibility. *See, e. g., United States v. Stone,* 472 F.2d 909, 913–14 (5th Cir. 1973).

**10.** When compared with the offending statements in cases where reversal was held to be warranted, *e. g., United States v. Somers,* 496 F.2d 723, 737, n. 6 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Signer,* 482 F.2d 394, 398–400 & n. 1 (6th Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973), the remarks of this prosecutor seem remarkably restrained.

lant was previously indicted for conspiracy to violate 18 U.S.C. § 1962(c) (conduct of enterprise through a pattern of racketeering activity or collection of unlawful debt). One of the overt acts charged in furtherance of the conspiracy was the August beating, which the government alleged was inflicted because Klein was not turning over ten percent of his proceeds to appellant. A jury delivered a general verdict acquitting appellant of the conspiracy charge. *United States v. Tashjian*, D.Mass., No. CR 79–47–G.

▮ The short answer is that collateral estoppel only bars relitigation of an issue of ultimate fact which was actually or necessarily determined by the former judgment. *Ashe v. Swenson*, 397 U.S. 436, 443–44, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).

> "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, [the proper] approach requires a court to 'examine the record of a prior proceeding,' taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Id.* at 444, 90 S.Ct. at 1194.

In the former case involved here, evidence of the August beating was introduced in order to prove DeVincent's connection with a conspiracy, *inter alia*, to obstruct commerce by extortion of ten percent of the proceeds of local bust–out operations. The jury was instructed,

> "You don't even get to any other question on the particular episode here [the beating] unless you believe that Mr. DeVincent did in fact strike Mr. Klein for the purposes alleged here, that is, to get 10 per cent from Klein .... If you conclude that the thing was unrelated to the bust–out deal, but was rather related to some wagering or gambling or other matters, then the Government has failed in its burden with respect to Mr. DeVincent." *United States v. Tashjian.*

On this charge, a rational jury could have found that the beating did take place, but was related to some other matter than appellant's alleged extortion of ten percent of Klein's proceeds. Alternatively, it could have found that the beating took place for the purpose alleged but that there was no conspiracy; in fact all defendants were acquitted on the conspiracy charge. The significance of the beating in the present case is first, the fact that it took place, and second, its alleged connection with appellant's loans to Klein—matters unrelated to the protection racket.

Finally, appellant attacks the validity of the indictment delivered against him. A special grand jury was impanelled in February, 1976, to investigate various alleged violations of federal law. It began hearing evidence in August, 1976, and its term was extended several times. The evidence presented was used to prepare the indictment in the present case, as well as that in *United States v. Tashjian, supra* ; both were presented to the grand jury on February 7, 1979, and returned the same day.

Appellant argues that because the indictment was only presented after all the evidence was heard, the grand jury would not have remembered the evidence when voting on the indictment. He further complains that because the prosecution did not read the indictment to the grand jury, there is no proof that the grand jury as a whole was acquainted with its contents. In short, says appellant, "it simply cannot be said that the entire grand jury knew what was being charged."

▮ On being granted a hearing on his charge that the grand jury did not read the indictment, *DeVincent v. United States*, 602 F.2d 1006 (1st Cir. 1979), appellant produced no evidence whatsoever which would support his charge.[11] He thus failed to overcome the "strong presumption of regularity accorded to the findings of grand juries." *United States v. West*, 549 F.2d 545, 554 (8th Cir.), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977). We according-

---

11. At the hearing, appellant produced the special attorney with the Department of Justice who was responsible, in its later stages, for the investigation leading up to the two indictments.

ly find it unnecessary to decide whether and under what circumstances the grand jury's failure to consider the precise language of an indictment requires its dismissal. *See DeVincent v. United States, supra,* 602 F.2d at 1009–10; *Gaither v. United States,* 413 F.2d 1061 (D.C.Cir.1969).

 Nor are we prepared to hold that a grand jury may not return an indictment presented to it after all the evidence is in. "An indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on its merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). A grand jury is not charged with a final adjudication of guilt or innocence; "[r]ather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States v. Calandra,* 414 U.S. 338, 343–44, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). It is given considerable flexibility in the evidence it may hear and the procedures it may employ. *Id.; Costello v. United States, supra,* 350 U.S. at 362, 76 S.Ct. at 408. The Supreme Court has rejected, as unnecessary to the assurance of a fair trial and as produc-. tive of interminable delay, "a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Id.* at 363–64, 76 S.Ct. at 409 (hearsay); see *United States v. Calandra, supra* (evidence obtained in violation of the Fourth Amendment); *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) (evidence obtained in violation of the Fifth Amendment).

If "the validity of an indictment is not affected by the character of the evidence considered", *United States v. Calandra, supra,* 414 U.S. at 344–45, 94 S.Ct. at 618, we find little room to dismiss an indictment because it was not before the grand jury at the time the evidence was presented. *Cf. United States v. Addington,* 471 F.2d 560, 568–69 (10th Cir. 1973) (failure to give grand jury a copy of applicable statutes or to instruct it on elements of offenses and other legal points not sufficient grounds to dismiss indictment). Such a holding would require evidence presented before an investigatory grand jury in the pre–indictment stage to be reproduced before the same or another grand jury after the indictment has issued. This would involve considerable duplication of effort, and would endanger compliance with various time limits, such as the time for which a grand jury may legally be impanelled, 18 U.S.C. § 3331, and applicable statutes of limitations. We see no reason so to hamper the functioning of the investigatory grand jury.

*Affirmed.*

He testified that the indictments, being lengthy, were not read to the jury; that the jury was left alone with the indictments and later signified that they had considered them. There was evidence that the indictments were read at least by the foreman, who pointed out a typographical error in one of them. While we do not imply that a reading by the foreman is sufficient, *see Gaither v. United States,* 413 F.2d 1061 (D.C.Cir.1969), neither do we accept appellant's negative inference that because the foreman read them, no one else did.