UNITED STATES of America, Plaintiff,

v.

David GARCIA–BELTRAN, Miguel A. Collazo–Diaz, and Marina Santiago–Rivera, Defendants.

Crim. No. 94–274 (HL).

United States District Court, D. Puerto Rico.

June 16, 1995.

**68**

Joseph C. Laws, Hato Rey, PR, for David Garcia–Beltran.

Rafael F. Castro–Lang, San Juan, PR, for Miguel A. Collazo–Diaz.

Peter J. Satz–Hanley, San Juan, PR, for Marina Santiago–Rivera.

## OPINION AND ORDER

LAFFITTE, District Judge.

Before the Court are motions to dismiss the indictment filed by codefendants Miguel A. Collazo–Diaz (Collazo–Diaz), Marina Santiago–Rivera (Santiago–Rivera), and David Garcia–Beltran (Garcia–Beltran), and the government's opposition thereto.

### FACTUAL BACKGROUND

On August 24, 1994, all defendants were present at a party at Karla Rodriguez' house, located in Toa Alta, Puerto Rico. At approximately 9:15 p.m. that night, Abner Polanco Alicea (Polanco) and Karla arrived at Karla's house, where there was a party. Polanco parked his wine-colored Toyota Tercel in front of Karla's house and he and Karla went inside.

While Polanco was in one bedroom of Karla's house, defendants went into another bedroom and discussed taking Polanco's pistol. Defendant Garcia–Beltran stated that it was necessary to kill Polanco, because if defendants only were to beat up Polanco and take away his pistol, a gang war would start. When Polanco came out of the bedroom and sat down on the sofa in the living room, defendant Rafael Rivera (Rivera) walked out of the other bedroom and sat behind Polanco. Polanco loaded his pistol while looking at Rivera, and then Polanco returned the pistol to his waistband. Rivera then left the living room, went into the bedroom where the other defendants were, and told Garcia–Beltran what Polanco had done. Rivera asked for Garcia–Beltran's 357 Magnum. Garcia–Beltran gave Rivera the gun, and told Rivera to watch himself.

Later on that night, as the party continued, Garcia–Beltran stated that he was going to shoot Polanco on the sofa. Karla asked Garcia–Beltran to not shoot Polanco in her house. Defendant Fernando Rodriguez Reich (Fernando) suggested a plan to defendants that they take Polanco to another place and leave him there.

Following Garcia–Beltran's orders, defendants Collazo–Diaz, Manuel de Jesus Garcia (de Jesus) and Jose Rodriguez Rodriguez (Rodriguez) bolted out of the bedroom and

attacked Polanco, who was still sitting on the sofa in the living room. They all struggled for Polanco's pistol, which was finally taken away from Polanco by Rivera. Rivera pointed the pistol at Polanco's stomach. Thinking that Rivera and the others were joking, Polanco told them not to play around. Defendant Collazo–Diaz slapped Polanco across the mouth and said that it was not a joke. Collazo–Diaz also asked Polanco for his car keys, which Polanco gave to de Jesus.

Defendants Collazo–Diaz, Rodriguez, and Rivera took Polanco to Polanco's Toyota Tercel and placed Polanco inside the car. De Jesus drove the car, and defendants Collazo–Diaz, Rodriguez, and Rivera were passengers. As they drove away from Karla's house, Collazo–Diaz and Rivera repeatedly hit Polanco. Rodriguez asked for Polanco's pistol from Collazo–Diaz. When the defendants arrived at Palo Blanco, they took Polanco out of the car. Collazo–Diaz asked Polanco for his wallet. Taking Polanco's wallet, Collazo–Diaz told Polanco to take off his shirt and to lie down on the ground. Collazo–Diaz then instructed Rivera to shoot Polanco. Rivera shot Polanco once with the 357 Magnum. Then Rodriguez shot Polanco repeatedly until all the rounds from the gun were expended. Having been ordered by Collazo–Diaz to ensure the death of Polanco, Rivera fired another shot at Polanco with the 357 Magnum.

Returning to Karla's house, defendants Collazo–Diaz, Rivera, Rodriguez, and de Jesus ran into Fernando. They all went back to Karla's house together. When said defendants arrived at Karla's house, they briefed Garcia–Beltran on their actions and handed Garcia–Beltran Polanco's pistol, bullets, and money. Giving Fernando twenty dollars out of Polanco's wallet, Garcia–Beltran told Fernando to buy the gasoline with which they would burn Polanco's car.

## DISCUSSION

### A. Constitutionality of 18 U.S.C. § 2119— the Commerce Clause

Under section 2119 of title 18,

Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so ...

shall be subject to federal criminal liability. 18 U.S.C. § 2119.[1]

This Court has held section 2119 to be constitutional under the Commerce Clause. *United States v. Nunez Rodriguez*, 871 F.Supp. 545, 548 (D.P.R.1994). However, this case was decided prior to the recent Supreme Court decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), where the Supreme Court struck down a congressional criminal statute under the Commerce Clause. Additionally, the First Circuit has not spoken, neither prior to nor after *Lopez*, on the issue of whether or not the carjacking statute is constitutional under the Commerce Clause. Accordingly, the Court looks to recent Supreme Court Commerce Clause precedent and sister circuit and district court cases to determine the constitutionality of this statute.

Under the United States Constitution, the Congress has the authority to "regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3. "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulato-

---

1. The Court notes that Congress amended 18 U.S.C. § 2119 in Public Law 103–322, Title VI, § 60003(a)(14), effective September 13, 1994. 18 U.S.C. § 2119 (Supp.1995). The amendment struck ", possessing a firearm as defined in section 921 of this title," and inserted ", with the intent to cause death or serious bodily harm". The amendment replacing the firearm possession element broadens the scope of § 2119 to those

carjackings committed without a firearm. This amendment, approved after the occurrence of the crime for which defendants are charged, is not applicable to defendants. *See United States v. Bodre*, 948 F.2d 28, 31 (1st Cir.1991) (Criminal laws which were enacted after the crime was committed and materially disadvantage a defendant may not be used to retroactively punish a defendant.); U.S. Const., Art. I, § 9, cl. 3.

ry means selected and the asserted ends." *Hodel v. Indiana,* 452 U.S. 314, 323–24, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981).

■ The Supreme Court has defined three broad categories of activity that Congress may regulate under its Commerce Clause authority. "First, Congress may regulate the use of the channels of interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (citations omitted). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* (citations omitted). And "[f]inally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Id.* at —— – ——, 115 S.Ct. at 1629–30 (citations omitted). In other words, whether or not the regulated activity " 'substantially affects' interstate commerce." *Id.* at ——, 115 S.Ct. at 1630.

■ Numerous circuit courts have held that the carjacking statute is constitutional under the Commerce Clause. *United States v. Johnson,* 22 F.3d 106, 109 (6th Cir.1994) ("carjackings as a category of criminal activity have an effect on interstate travel and the travel of foreign citizens to this country"); *United States v. Harris,* 25 F.3d 1275, 1280 (5th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 458, 130 L.Ed.2d 366 (1994) ("[b]ecause of the obvious effect that carjackings have on interstate commerce, we hold that the carjacking statute is a valid exercise of Congress's Commerce Clause powers."); *United States v. Martinez,* 49 F.3d 1398, 1400–01 (9th Cir.1995) (upheld section 2119 because (1) the court could not "say that Congress had no rational basis for its findings" and (2) "a *present* nexus between a regulated activity and interstate commerce is not required under the Commerce Clause"); *United States v. Overstreet,* 40 F.3d 1090, 1093 (10th Cir. 1994) (finding the "nexus between section

2119 and interstate commerce in: 1) the effect of carjacking on interstate travel and the travel of foreign citizens in this country . . .; 2) the impact of the sale of stolen cars and parts in interstate commerce; and 3) increased insurance premiums that result from carjackings"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v. Williams,* 51 F.3d 1004, 1008–09 (11th Cir.1995) (adopting the reasoning in the above cases).[2]

As seen above, there is a lot of support from the other circuit and district courts to support a finding that the carjacking statute is constitutional. However, the Court is aware that said cases were all decided *prior* to the Supreme Court's decision in *Lopez,* which struck down a statute for exceeding Congress' authority under the Commerce Clause.

In *Lopez,* the Supreme Court had before it the issue of whether the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (Supp. V 1988), was a constitutional exercise of Congress' authority to regulate interstate commerce. The Act states "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 ed. Supp. V). As noted by the Supreme Court, "[t]he Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1626.

The Court applied the three broad categories of constitutional congressional regulation to the Gun–Free School Zones Act. First, as schools nor gun possession deals with the "channels of interstate commerce" the Court quickly dismissed this statute's applicability to the first broad category. *Id.* at ——, 115 S.Ct. at 1630. The Court also found that the

---

**2.** Numerous district courts have also upheld the carjacking statute as constitutional under the Commerce Clause. *See Nunez Rodriguez,* 871 F.Supp. 545 (D.P.R.1994); *United States v. Payne,* 841 F.Supp. 810 (S.D.Ohio 1994); *United States v. Stith,* 824 F.Supp. 128 (S.D.Ohio 1993), *aff'd,* 38 F.3d 1217 (6th Cir.1994); *United States*

*v. Eskridge,* 818 F.Supp. 259 (E.D.Wis.1993); *United States v. Watson,* 815 F.Supp. 827 (E.D.Pa.1993). *But see United States v. Cortner,* 834 F.Supp. 242 (M.D.Tenn.1993), *rev'd sub nom United States v. Osteen,* 30 F.3d 135 (6th Cir. 1994); *United States v. Mallory,* 884 F.Supp. 496 (S.D.Fla.1995).

Act did not deal with an instrumentality, or a person or thing in interstate commerce. *Id.*

The Court next turned to the third category to determine whether gun possession in a school zone substantially affects interstate commerce. *Id.* The Court stated that the pattern of past Supreme Court cases show that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." [3] *Id.* The Court found: (1) that section 922(q) had nothing to do with economic enterprise or commerce, (2) that the Act was not a part of a larger economic activity regulatory scheme, (3) that the Act did not require as one of its jurisdictional elements that the firearm possessed have a nexus to interstate commerce, and (4) that Congress had not assisted the Court with legislative findings showing the effect upon interstate commerce. *Id.* at ——–——, 115 S.Ct. at 1630–32.

Additionally, the Court rejected as too tenuous the Government's argument that guns in school would result in the significant "cost of crime" on our society, and rejected as being too limitless the Government's argument that guns in school would result in decreased national productivity. *Id.* at ——, 115 S.Ct. at 1632. The Court stated that Congress would have the authority under the Commerce Clause to regulate a commercial activity that substantially affected interstate commerce and also affected the educational process. However, the Court explained, "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at ——, 115 S.Ct. at 1634. Specifically, the Court stated that "[r]espondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have

any concrete tie to the interstate commerce." *Id.*

The Court now turns to the application of the *Lopez* Court's analysis to determine the constitutionality of section 2119. As carjackings do not involve channels nor instrumentalities necessarily of interstate commerce, the Court analyzes the constitutionality of section 2119 under the third category laid out by the *Lopez* decision for Commerce Clause cases: the "substantially affects interstate commerce test."

Here, unlike schools which are local in nature, the focus is on the violent taking of cars, which are commodities and instruments of travel. By the language of the statute it is clear that these cars must have been "transported, shipped, or received in interstate or foreign commerce." 18 U.S.C. § 2119.

The legislative history of the Act discusses the congressional view that the passing of the carjacking statute was necessary due to the impact carjacking had on interstate commerce. The report details how carjacked cars may be turned into profits by (1) dismantling the car to be sold as parts, (2) washing the title and selling the car, (3) exporting the vehicle for sale outside of the United States. H.R.Rep. No. 851(III), 102nd Cong., 2nd Sess. (1992), U.S.Code Cong. & Admin.News 1992, pp. 2829, 2895. The legislative history further explains that the economic impact of the above three profit schemes increases the automobile insurance premiums paid by car owners. *Id.* Specifically, Congress found that

> Automobile theft has become the Nation's number one property crime problem. More than 1.6 million motor vehicles were reported stolen in 1991, an increase of 34 percent since 1986. The stolen automobiles were worth an estimated $8–9 billion, representing over 50 percent of the property lost to crime ... As much as 64

---

**3.** The Court cited the following cases as exemplifying this pattern: the regulation of (1) coal mining, *Hodel v. Virginia Surface Mining & Reclamation Assn.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); (2) intrastate extortionate credit transactions, *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); (3) restaurants utilizing substantial interstate supplies, *Katzenbach v. McClung*, 379 U.S. 294,

85 S.Ct. 377, 13 L.Ed.2d 290 (1964); (4) inns and hotels catering to interstate guests, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); and (5) production and consumption of home-grown wheat, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630.

percent of an automobile owner's comprehensive insurance premium is attributable to theft claims.

*Id.*

Unlike the Supreme Court's view of guns in school zones, the above facts about the carjacking reality in the United States show that it is not just a local issue concerning local people committing crimes that are local in nature. Rather, carjacking is a systematic criminal activity that substantially affects the interstate and foreign commerce of automobiles and the interstate commerce of automobile insurance. The gun-free school zones law criminalized *mere possession* of a gun in a school zone, a stationary geographic area. The Act did not require the gun to have travelled in interstate commerce. The carjacking statute, on the other hand, criminalizes the taking of a vehicle with a firearm.[4] The Act requires that the taking be of a vehicle which has moved through interstate commerce, and the legislative history shows that Congress found that following the carjacking, said vehicles were moving back through interstate and foreign commerce.

Carjacking and the fear of carjacking additionally impact interstate travel and the travel of foreign citizens throughout this country. Accordingly, this Court finds that under the recent analysis offered by the Supreme Court in *Lopez*, section 2119 is a rational means by which Congress seeks to address the legitimate interest of curbing carjackings, which have a substantial affect on interstate commerce. The Court shall deny defendants' motion to dismiss as to the issue of section 2119's constitutionality under the Commerce Clause.

## B. The Charge Under 18 U.S.C. § 2119

■ Defendants Collazo–Diaz and Santiago–Rivera next argue that they cannot be prosecuted under the carjacking statute as defendants' alleged criminal activity is more akin to a kidnapping and murder case. Under section 2119, the elements required are (1) the possession of a firearm, (2) the taking of a motor vehicle, (3) which has been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another, (5) by force and violence or by intimidation or attempts to do so. *18 U.S.C. § 2119.* Section 2119 does not require that the vehicle be taken with the intent of selling the pieces, or the intent of washing the *title of* the car to sell in another place, or the intent to sell the vehicle overseas. *Harris*, 25 F.3d at 1279 (Defendants' motive in using a firearm to take the car is irrelevant).

■ Here, defendants' alleged actions fit the elements of the crime: (1) defendants used Polanco's pistol, and later Garcia–Beltran's 357 Magnum, (2) to take Polanco's motor vehicle, (3) which allegedly had been transported, shipped, or received in interstate and foreign commerce, (4) from Polanco's person or presence, (5) when the car keys were taken from Polanco at gun point. Accordingly, the Court finds that the government has correctly charged defendants with violation of section 2119 and shall dismiss defendants' motion as to this issue.

## C. Aiding and Abetting

Defendants Garcia–Beltran and Santiago–Rivera further argue that the government has unlawfully indicted them under section 2119. There is a " 'strong presumption of regularity accorded to the findings of grand juries.' " *United States v. DeVincent*, 632 F.2d 147, 154 (1st Cir.), *cert. denied*, 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980). "A grand jury is not charged with a final adjudication of guilt or innocence; '[r]ather it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.' " *Id.* at 155 (citation omitted).

■ To aid and abet another to commit a crime, defendants must " 'in some sort associate [themselves] with the venture, . . . participate in it as something that [they wish] to bring about, . . . seek by [their] action[s] to make it succeed.' " *United States v. Ramirez-Ferrer*, —— F.3d ——, ——, 1995 WL 237041, *3 (1st Cir. April 27, 1995) (citing *Nye & Nissen v. United States*, 336 U.S. 613,

4. *See* note 1.

69 S.Ct. 766, 93 L.Ed. 919 (1949)). As seen from the facts listed above, both defendants Garcia–Beltran and Santiago–Rivera were located in the bedroom participating in the plan to take Polanco to Palo Blanco and murder him. Simply because said defendants were not present during the shooting or the beating of Polanco in his Toyota and then at Palo Blanco does not serve to exculpate said defendants. It is enough that defendants Garcia–Beltran and Santiago–Rivera's actions contributed to the carjacking and subsequent murder of Polanco. In other words, their actions made the scheme succeed. Accordingly, the Court finds that there is ample support for the indictment against defendants Garcia–Beltran and Santiago–Rivera. Defendants have not met their burden as they have failed to show any evidence that the government has not met the probable cause standard for the indictment against said codefendants. Therefore, defendants challenge to their indictment cannot succeed.

## D. Production of the Grand Jury Evidence

This Court granted defendants' motion to suppress Polanco's dying declaration, which was presented to the grand jury, because the Court found the declaration to be untrustworthy. Defendants argue that because the Court suppressed the declaration, there is no probable cause to support their indictment. Accordingly, defendants request that the government disclose the grand jury evidence under Fed.R.Crim.P. 6(e)(3)(C)(ii).

Grand juries carry a presumption of regularity, and therefore, a challenger carries a very heavy burden. *United States v. Al Mudarris,* 695 F.2d 1182, 1185 (9th Cir.), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983). Moreover, the grand jury "is given considerable flexibility in the evidence it may hear and the procedures it may employ." *DeVincent,* 632 F.2d at 155. "The Supreme Court has rejected as unnecessary to the assurance of a fair trial and as productive of interminable delay, 'a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence.' " *Id.* (cita-

tions omitted). An indictment may in fact be based solely on hearsay. *Al Mudarris,* 695 F.2d at 1185 (citing *Costello v. United States,* 350 U.S. 359, 363–64, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956)). Here, the fact that the grand jury indictment was based in part on inadmissible evidence such as the dying declaration, does not provide defendants with a colorable challenge to the indictments. Additionally, regardless of the dying declaration, there is ample evidence to support an indictment against both Garcia–Beltran and Santiago–Rivera for aiding and abetting.

Under Fed.R.Crim.P. 6(e)(3)(C)(ii), disclosure of the grand jury minutes may be permitted by the Court if defendants "show that grounds exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Defendants have failed to make such a showing. Accordingly, the Court shall deny defendants' motion requesting an order for the government to produce the grand jury minutes. *See United States v. Llaca Orbiz,* 513 F.2d 816, 818–19 (1st Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 117, 46 L.Ed.2d 88 (1975).

**WHEREFORE,** the Court hereby **denies** the motions to dismiss the indictment filed by defendants Collazo–Diaz, Garcia–Beltran and Santiago–Rivera.

IT IS SO ORDERED.