USCA1 Opinion

 

 August 9, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1182 No. 92-1258 UNITED STATES OF AMERICA, Appellee, v. DARRYL WHITING, a/k/a G., GOD, RAH, Defendant, Appellant. ____________________ No. 92-1183 UNITED STATES OF AMERICA, Appellee, v. SEAN DIXON, a/k/a MICHAEL WHITE, Defendant, Appellant. ____________________ No. 92-1184 UNITED STATES OF AMERICA, Appellee, v. RENALDO PLEDGER, a/k/a EUGENE NOBLE, Defendant, Appellant. ____________________ No. 92-1185 UNITED STATES OF AMERICA, Appellee, v. EDWIN CARMICHAEL, a/k/a FREEDOM, Defendant, Appellant. ____________________ No. 92-1259 UNITED STATES OF AMERICA, Appellee, v. WILLIAM BOWIE, a/k/a CUDA, DIAMOND, Defendant, Appellant. ____________________ No. 92-1442 UNITED STATES OF AMERICA, Appellee, v. STEVEN WADLINGTON, a/k/a MOHAMMED, Defendant, Appellant. ____________________ No. 92-1443 UNITED STATES OF AMERICA, Appellee, v. KENNETH BARTLETT, a/k/a CHEYENNE, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court, issued on July 6, 1994, is amended as follows: On page 32, line 9 of only full paragraph, replace the material beginning with "If these" through "Id. at 1778-79." with the ___ following: If these criteria are met, the court of appeal "has authority to order correction, but is not required to do so," id. at ___ 1778, and should exercise its remedial discretion only "in those circumstances in which a miscarriage of justice would otherwise result," or where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 1779 (internal quotations omitted). ___ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1182 No. 92-1258 UNITED STATES OF AMERICA, Appellee, v. DARRYL WHITING, a/k/a G., GOD, RAH, Defendant, Appellant. ____________________ No. 92-1183 UNITED STATES OF AMERICA, Appellee, v. SEAN DIXON, a/k/a MICHAEL WHITE, Defendant, Appellant. ____________________ No. 92-1184 UNITED STATES OF AMERICA, Appellee, v. RENALDO PLEDGER, a/k/a EUGENE NOBLE, Defendant, Appellant. ____________________ No. 92-1185 UNITED STATES OF AMERICA, Appellee, v. EDWIN CARMICHAEL, a/k/a FREEDOM, Defendant, Appellant. ____________________ No. 92-1259 UNITED STATES OF AMERICA, Appellee, v. WILLIAM BOWIE, a/k/a CUDA, DIAMOND, Defendant, Appellant. ____________________ No. 92-1442 UNITED STATES OF AMERICA, Appellee, v. STEVEN WADLINGTON, a/k/a MOHAMMED, Defendant, Appellant. ____________________ No. 92-1443 UNITED STATES OF AMERICA, Appellee, v. KENNETH BARTLETT, a/k/a CHEYENNE, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, U.S. District Judge] ___________________ ____________________ Before Breyer,* Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ ____________________ ____________________ *Chief Judge Stephen Breyer heard oral argument in this matter, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). Gary C. Crossen, by Appointment of the Court, and Stephen D. ________________ __________ Sowle with whom Sarah Reed, John A. Shope and Foley, Hoag & Eliot were _____ __________ _____________ ___________________ on briefs for appellant Darryl Whiting. John H. LaChance, by Appointment of the Court, with whom LaChance ________________ ________ and Whatley was on briefs for appellant Sean Dixon. ___________ John C. Doherty, by Appointment of the Court, for appellant _________________ Renaldo Pledger. Janet L. Sanders with whom Zalkind, Rodriguez, Lunt & Duncan was ________________ __________________________________ on briefs for appellant Steven Wadlington. Lois Lewis, by Appointment of the Court, for appellant Edwin ___________ Carmichael. John P. Slattery, by Appointment of the Court, with whom Wysocki ________________ _______ and Slattery was on brief for appellant Kenneth Bartlett. ____________ Paul A. Dinsmore, by Appointment of the Court, for appellant _________________ William Bowie. Robert W. Iuliano, Assistant United States Attorney, Paul V. __________________ ________ Kelly, Assistant United States Attorney, (for IAD issue), and Thomas _____ ______ C. Frongillo with whom Donald K. Stern, United States Attorney, was on ____________ _______________ briefs for the United States. ____________________ July 6, 1994 ____________________ BOUDIN, Circuit Judge. These cases arise out of an ______________ extensive undercover law enforcement operation targeted at the "New York Boys," a large-scale drug distribution ring operating out of the Orchard Park Housing Project in Roxbury, Massachusetts. The seven defendants currently before the court appeal their convictions, their sentences, or both. We affirm the district court's rulings on all but one point.1 I. On December 11, 1990, a federal grand jury indicted Darryl Whiting, Sean Dixon, Renaldo Pledger, Edwin Carmichael, and Steven Wadlington--as well as 26 co- defendants--for conspiracy to distribute cocaine in violation of 21 U.S.C. 846. A superseding indictment returned on April 11, 1991, expanded the case to include a total of 50 defendants, including Kenneth Bartlett and William Bowie. The individual defendants were also charged with various combinations of substantive cocaine distribution, 21 U.S.C. 841(a)(1), firearms offenses, 18 U.S.C. 922(g)(1); 26 U.S.C. 5861(d), or money laundering, 18 U.S.C. 1956(2)(1), and Whiting was alleged to be the organizer and ____________________ 1The published version of this opinion includes only the statement of facts (part I) and the discussion of those issues that may be of general interest (parts II and III). The remaining portions of the opinion as filed (parts IV-VI) address issues that do not appear to have precedential importance. See First Cir. R. 36.2. ___ -8- -8- supervisor of a continuing criminal enterprise in violation of 21 U.S.C. 848. Rather than try 50 defendants at once, the district court severed the case into smaller cases. The first five defendants named above ("the first-trial defendants") were placed in the initial trial group, along with a sixth defen- dant (David Waight) who has not appealed. Trial began on June 17, 1991, and continued for 18 days spread over the next four weeks. The evidence consisted primarily of the testimony of undercover agents and cooperating co-defendants. Taken in the light most favorable to the government, United ______ States v. Gonzalez-Torres, 980 F.2d 788, 789 (1st Cir. 1992), ______ _______________ the evidence showed the following: The first-trial defendants, together with many other individuals, were members of or associated with the "New York Boys," a street gang headed by Whiting and operating out of the Orchard Park Housing Project in Roxbury, Massachusetts. The gang was so named because many of its members hailed from Queens, New York. During the period from 1986 to 1990, the New York Boys evolved into a large, highly structured organization that employed up to 100 different people and sold cocaine and cocaine base ("crack" cocaine) in shifts 24 hours a day. The Whiting organization received its cocaine from New York City. A number of couriers transported the drugs to -9- -9- Boston on airline shuttles. The drugs were then processed-- "cut" with dilutants and divided into individual bags--at several different apartments located outside the Orchard Park Project. Finally, the cocaine was sold at Orchard Park through an elaborate network of personnel: "runners" who met customers and took their money; other individuals who "worked the pack" by holding small quantities of cocaine and distributing it to incoming runners in exchange for cash; and a third group who held larger inventories of cocaine packs in more secure locations and periodically resupplied those "working the pack." Additional workers served as lookouts for police or provided security against rival gangs. During the organization's most prosperous period, the New York Boys sold as much as five kilograms of cocaine per week, grossing up to $100,000 in a single half-day shift. The organization sent substantial sums out of Boston via Western Union, giving rise to money-laundering charges against Whiting and Carmichael. Many of the workers were paid up to $1,000 per week for their services, although not consistently. Whiting invested funds in various Roxbury businesses, including a barber shop, video store, and the Crown Social Hall. Although this hall functioned as a community center, it also served as a front for drug distribution activities and a means of laundering the proceeds of drug sales. Whiting also sponsored rap concerts, -10- -10- barbecues, and other social events, and provided gifts of clothing and money to youth in the Roxbury community. The government's witnesses testified about numerous weapons possessed by defendants and acts of violence done to maintain discipline within the organization and security vis- a-vis rival gangs. Security measures were elaborate: gang members were equipped with binoculars, walkie-talkies, and headphones and had ready access to firearms ranging from riot pump shotguns to Uzi machine guns. There was extensive evidence of beatings and other acts of violence against members of the organization who stole money or cocaine, attempted to sell drugs on their own, or otherwise disobeyed orders. The first-trial defendants mounted a defense consisting primarily of attacks on the credibility of the government's witnesses. Defense counsel attacked the testimony of one of the government's two primary undercover operatives, Jeffrey Coy, by emphasizing instances in which Coy had failed to follow proper police procedures and by showing that Coy had suffered serious psychological and emotional problems during and after the investigation. Defendants also sought to undermine the second undercover agent, Maurice Dawkins, by way of testimony from a former supervisor that Dawkins was not "a man of truth." Defense counsel also won admissions that many of the cooperating co-defendants who testified had -11- -11- drug problems, and that some would be willing to lie to further their own interests. Whiting himself testified that he was not involved in drug dealing and that his income came from legitimate business activities. On July 24, 1991, the jury convicted Whiting of one count of engaging in a continuing criminal enterprise, 21 counts of distribution of cocaine, and one count of money laundering; he was acquitted of two counts of distribution of cocaine.2 Dixon, a runner and security worker, was convicted of conspiracy to distribute cocaine and of one substantive distribution count, but was acquitted on an additional distribution count. Pledger, another security worker, was convicted on the conspiracy count and on one count of being a felon in possession of a firearm. Edwin Carmichael, who had a managerial role, was convicted of conspiracy to distribute cocaine and of one count of money laundering. Steven Wadlington, a security worker, was convicted on the conspiracy count and of one count each of distribution of cocaine and possession of an unregistered firearm; he was acquitted on two additional distribution counts. ____________________ 2Whiting was also convicted of conspiracy to distribute cocaine; the district court, however, vacated that count on the ground that it was a lesser included offense subsumed within the continuing criminal enterprise conviction. -12- -12- Sentences were imposed on October 7, 21, and 22, 1991, and the five defendants filed timely notices of appeal. The specific sentences imposed were as follows: Darryl Whiting Life without parole on the continuing criminal enterprise count; 240 months imprisonment for each of 21 distribution counts and one money laundering count, to be served concurrently; and a $1200 special assessment. Sean Dixon 188 months imprisonment and 60 months supervised release on the conspiracy count; 60 months imprisonment for distribution count, to run concurrently; and a $100 special assessment. Renaldo Pledger 235 months imprisonment and 60 months supervised release; and a $100 special assessment. Edwin Carmichael 262 months imprisonment and 60 months supervised release; and a $100 special assessment. Steven Wadlington 360 months imprisonment on the conspiracy count and 60 months supervised release; 240 months imprisonment on distribution count; 120 months imprisonment on the firearms count, all sentences to run concurrently; and a $150 special assessment. Bartlett and Bowie were among six co-defendants slated for trial in the second group created by the district court. Both Bartlett and Bowie were alleged to have served as security workers. Bowie, the government claimed, acted as the chief of security for the organization and as Whiting's bodyguard. The second trial commenced on November 19, 1991. On the sixth day of trial, Bartlett and Bowie pled guilty to conspiracy to distribute cocaine. -13- -13- Bowie was sentenced on February 10, 1992, to 262 months imprisonment and 60 months supervised release, as well as a $50 special assessment. Bartlett was sentenced on March 11, 1992, to an identical sentence; in his case, however, the district court ordered that the sentence be served consecutively to two previously imposed state sentences for second degree murder and firearms charges. Bowie and Bartlett have each appealed from their sentences, and Bowie has challenged the validity of his guilty plea as well. II. We consider first several arguments jointly presented by the first-trial defendants: Whiting, Dixon, Pledger, Carmichael, and Wadlington. Each asserts that the district court erred in refusing to permit certain testimony aimed at undermining the credibility of one of the government's undercover operatives; in allowing the prosecutor to make allegedly inflammatory remarks to the jury; in mischarging the jury on the definition of "reasonable doubt"; and in calculating the amount of cocaine for which the defendants were held accountable at sentencing. Although none of these arguments is frivolous, we do not find any of them ultimately persuasive. A. Impeachment of Anthony Hewitt _____________________________ A key government witness at trial was Maurice Dawkins, an undercover operative who made a total of 11 purchases of -14- -14- cocaine from various members of the Whiting organization. Many of Dawkins' dealings were uncorroborated by tape recordings or other witnesses; as a result, his credibility became a central issue at trial. In an attempt to undermine Dawkins, the defendants called as a witness Anthony Hewitt, a deputy superintendent of the Jamaican Constabulary and Dawkins' former commanding officer. Hewitt testified that, in his opinion, Dawkins was not a truthful individual and had a reputation for untruthfulness in Jamaica. Fed. R. Evid. 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, . . . may not be proved by extrinsic evidence." Accordingly, defense counsel confined themselves to eliciting from Hewitt his general opinion of Dawkins' truthfulness and the general reputation for truthfulness that Dawkins had among his co-workers in Jamaica. See Fed. R. Evid. 608(a). On cross-examination of ___ Hewitt, the government elicited testimony regarding specific instances of Dawkins' good conduct: in particular, Hewitt was led to acknowledge various commendations that Dawkins had received while on the Jamaican force, as well as the fact that Dawkins had been injured in the line of duty. On redirect examination, the defense sought to question Hewitt about specific instances in which Hewitt and other members of the Jamaican Constabulary had found Dawkins to be -15- -15- not credible.3 Defense counsel argued that the government had "opened the door" by eliciting testimony of specific acts of good character on cross-examination, but the trial judge refused to permit such testimony in light of Rule 608(b). In this court defendants repeat their claim under the rubric of "curative admissibility," which holds that "a trial judge, in his discretion, [may] admit otherwise inadmissible evidence in order to rebut prejudicial evidence which has already been erroneously admitted." United States v. Nardi, 633 F.2d 972, _____________ _____ 977 (1st Cir. 1980) (citations omitted). The defendants are mistaken in assuming that the government's evidence of Dawkins' good character was erroneously admitted. It is quite true that the government's evidence (of Dawkins' courage and good conduct) was not admissible under Rule 608(b) to accredit Dawkins because the episodes related only to Dawkins' general good character and not to his character for truthfulness. But by its own terms Rule 608(b) imposes its restriction only upon evidence that is offered for the purpose of buttressing credibility; it ________________ does not forbid evidence that happens to show good character ____________________ 3Specifically, the defense sought to introduce through Hewitt evidence that Dawkins had falsely reported that he was the victim of a shoot-out in 1987, and that Dawkins had been the subject of at least four civilian complaints of abuse and assault which he had denied but which the Jamaican Constabulary had deemed credible. -16- -16- but is offered for another legitimate purpose. See United _______________________________ ___ ______ States v. Abel, 469 U.S. 45, 55-56 (1984). ______ ____ Here, the government's exploration of Dawkins' record served two quite different purposes. First, the prosecutor sought to test Hewitt's familiarity with Dawkins' record, the inference being that Hewitt's own opinion and his report as to Dawkins' reputation were themselves untrustworthy if Hewitt knew little about Dawkins. Michelson v. United _________ ______ States, 335 U.S. 469, 480 (1948). Second, by showing ______ Dawkins' exemplary record, the prosecutor aimed to raise doubts about Hewitt's own motive in testifying against a fellow officer with a good record, and thus to impute prejudice to Hewitt. See Abel, 469 U.S. at 51. ___ ____ In some instances, the permissible inferences might be offered merely as pretext to smuggle in an impermissible one. But in this case, the government's first justification is ample and the second, if thinner, is at least plausible. Defendants would have been entitled, had they asked for it, to an instruction limiting the jury's use of the government evidence to these lines of inference and advising the jury that it was not entitled to infer Dawkins' character for truthfulness from his general good character. Accordingly, the doctrine of curative admissibility has no role in this case because there was no error to be cured. -17- -17- One could defend the admissibility of the bad character evidence in question by saying that just as the government used evidence of Dawkins' good character to impugn Hewitt's motive, evidence of Dawkins' bad character would tend to lessen doubts about Hewitt's readiness to testify against a former fellow officer. But the bad character evidence was not offered on this ground, and explaining the purpose for which disputed evidence is offered is normally required to preserve the issue on appeal. Tate v. Robbins & Myers, Inc., ____ _____________________ 790 F.2d 10, 12 (1st Cir. 1986). A general reference to "fighting fire with fire" is hardly much help to a district judge trying to make on-the-spot rulings in the middle of a hectic trial.4 B. Prosecutor's Rebuttal Argument ______________________________ Defendants' second set of arguments revolves around four remarks made by the prosecutor in his rebuttal argument to the jury at the close of the trial. We have taken allegations of such prosecutorial overreaching seriously in this circuit, e.g., Arrieta-Agressot v. United States, 3 F.3d ____ ________________ _____________ 525 (1st Cir. 1993); United States v. Santana-Camacho, 833 _____________ _______________ ____________________ 4There was no miscarriage of justice on this point. The inference that Hewitt was biased is not a very strong one. Similarly, evidence of Dawkins' bad character to refute the bad-motive inference is not very telling; indeed, such evidence could help to establish Hewitt's bias as well as to refute it. -18- -18- F.2d 371 (1st Cir. 1987), but in this case none of the remarks warrants reversal of appellants' convictions. The first remark complained of was the prosecutor s statement that "[Darryl Whiting] also brought the kids of Roxbury the guns, the drugs, the violence," followed by an exhortation to the jurors not to "let other kids be succored [sic] in by that flash, that cash, that deception." This statement was prejudicial, defendants argue, because "it sought to deflect [the jurors ] attention from the issues that they were sworn to decide, . . . and attempted to foist onto the jury responsibility for the extra-judicial consequences of a not guilty verdict." We agree that the "other kids" reference was improper, for "[t]he prosecutor should refrain from arguments [predicting] the consequences of the jury's verdict." American Bar Association, Standards _________ Relating to the Administration of Criminal Justice 3-5.8(d). __________________________________________________ In this case defense counsel failed to object at the time the allegedly prejudicial statement was made, so we review only for plain error. Arrieta-Agressot, 3 F.3d at ________________ 528. Courts are reluctant to find such error where the prosecutor s remarks were isolated and made to rebut specific statements by defense counsel. See United States v. Machor, ___ _____________ ______ 879 F.2d 945, 956 (1st Cir. 1989), cert. denied, 493 U.S. _____________ 1081 (1990). Here, the prosecutor was clearly responding to defense counsel's portrayal of Whiting as a philanthropist -19- -19- and benefactor of Roxbury's youth, and defendants do not point to other like instances of rhetorical excess. We do not believe that the prosecutor's remarks "so poisoned the well that the trial s outcome was likely affected." Arrieta- ________ Agressot, 3 F.3d at 528. ________ Defendants next object to the prosecutor's assertion that defendants closing arguments were "smoke screens floated your way by defense counsel . . . [who are] very able people here." This statement, defendants argue, "sought to convince the jury that the arguments of defense counsel were . . . manufactured by able lawyers seeking to hide the truth from the jury." We agree that the prosecutor should have focused on the merits of the defendants' arguments rather than their source. Again, defense counsel failed to object to the statement at trial, and we have little trouble in holding that this isolated misstep did not rise to the level of plain error. Defendants did object to the third allegedly offensive statement, arguing that the prosecutor improperly placed his own character at issue when he said that "[a]n attack on me and my colleagues and our ethics and our approach to this case not only [is] an affront to me personally, but a smoke screen." Although a prosecutor may not pledge his own character as a basis for inferring the defendant s guilt, see ___ United States v. Garza, 608 F.2d 659 (5th Cir. 1979), the _____________ _____ -20- -20- statement in this case referred to the government's conduct of its investigation, not the guilt or innocence of the defendants. The prosecutor's isolated remark responded to far harsher remarks of defense counsel that the government had suborned perjury. Finally, the trial judge properly instructed the jury to disregard the prosecutor's statement that he felt affronted. See United States v. Moreno, 991 ___ _____________ ______ F.2d 943, 948 (1st Cir.), cert. denied, 114 S. Ct. 457 _____________ (1993). Defendants' final claim concerns a government chart showing the organizational structure of the New York Boys and, specifically, listing Dixon as a processor and packager of cocaine. The evidence showed Dixon instead to be a runner and, when Dixon's counsel seized on the discrepancy in his closing argument, the prosecutor in rebuttal told the jury that the reference on the chart was a typographical error arising from the presence of another defendant with the same last name. Defendants' objection that this was "extra judicial testimony" by the prosecutor may be technically correct, but the prosecutor's misstep was a trivial one-- serving in part to correct an overstatement of Dixon's role-- and it certainly did not cause substantial prejudice. C. Reasonable Doubt ________________ -21- -21- Defendants objected to the trial court's instruction to the jury on the meaning of reasonable doubt, whose core was the following paragraph: Now, reasonable doubt is not a fanciful doubt, nor a whimsical doubt, nor a doubt based on conjecture, but is a doubt based on reason, as the name implies. The government is not required to establish guilt to a mathematical certainty or to a scientific certainty. The government is not required to exclude every other remote possibility. This circuit has repeatedly refused to require the district courts to define "reasonable doubt" in their instructions to the jury. E.g., United States v. ____ _______________ Littlefield, 840 F.2d 143, 146 (1st Cir.), cert. denied, 488 ___________ ____________ U.S. 860 (1988). Where the district court does define the term, we have suggested that "attempts at definition should not stray far from the consistently approved stock of charges on reasonable doubt." Id. at 646. We have left to the trial ___ judge, however, "the choice among acceptable linguistic alternatives." Tsoumas v. State of New Hampshire, 611 F.2d _______ _______________________ 412, 414 (1st Cir. 1980). The phrases employed in the paragraph quoted above are stock phrases and the defendants do not challenge most of them individually. They do assert that to call reasonable doubt "a doubt based on reason" is at odds with the Supreme Court's postulate that a reasonable doubt need not be articulable or even logical so long as it appeals to common sense. See Harris v. Rivera, 454 U.S. 339, 347 (1981). We ___ ______ ______ -22- -22- think that this argument rests on too fine a distinction and that a "doubt based on reason"--a phrase approved by this circuit on a number of occasions, e.g., United States v. ____ _____________ DeVincent, 632 F.2d 147, 152 (1st Cir.), cert. denied, 449 _________ ____________ U.S. 986 (1980)--is not a bar against using common sense but merely contrasts "reason" with "fancy," "whim," or "conjecture." Defendants' main objection is that the district court's emphasis on what is not a reasonable doubt so far outweighs its statement of what is a reasonable doubt as to lead the jury to concentrate overmuch on the former. By itself, the concept of proof "beyond a reasonable doubt" gives the defendant a substantial advantage, which is why defense counsel so often repeat those words in summation. Although the advantage is a legitimate one, it does not seem to us one that is likely to be undermined by an instruction that with a few general phrases indicates that not every doubt is a reasonable one. In any event, elsewhere in the charge the court in this case reminded the jury, in connection with the presumption of innocence, that a defendant is never to be convicted "on the basis of mere conjecture, surmise or guesswork." In other words, the jury was told that just as a fanciful doubt should not stand in the way of conviction, so too a reasonable doubt could not be papered over by conjecture, surmise or -23- -23- guesswork. Taking the reasonable doubt instruction "in the context of the overall charge," Cupp v. Naughten, 414 U.S. ____ ________ 141, 146-47 (1973), we think that the charge here was adequately balanced. D. Calculation of Drug Quantity ____________________________ Because defendants were convicted of conspiracy to distribute cocaine, they were held responsible at sentencing for "drugs [they] personally handled or anticipated handling, and, under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by [them] and were committed in furtherance of the conspiracy." United ______ States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993), ______ _________ cert. denied, 1994 U.S. Lexis 4738 (June 20, 1994). Based on ____________ the government's evidence at trial, the district court estimated that the Whiting organization distributed two kilograms of cocaine per week over a period of three years. Defendants now challenge this calculation, arguing that the district court based its estimate on unreliable evidence and improper extrapolation. We review factual findings by the sentencing court as to drug quantity only for clear error. Sepulveda, 15 F.3d at _________ 1196. "[T]he sentencing court has broad discretion to determine what data is, or is not, sufficiently dependable to be used in imposing sentence," United States v. Tardiff, 969 _____________ _______ F.2d 1283, 1287 (1st Cir. 1992), and we defer to any -24- -24- credibility determinations by the sentencing court. United ______ States v. Brewster, 1 F.3d 51, 54 (1st Cir. 1993). The ______ ________ burden is on the government to prove drug quantity by a preponderance of the evidence. United States v. Valencia- _____________ _________ Lucena, 988 F.2d 228, 232 (1st Cir. 1993).5 Because of the ______ impact of quantity on the length of sentence, we have said that in resolving doubts the sentencing court must "err on the side of caution." United States v. Sklar, 920 F.2d 107, _____________ _____ 113 (1st Cir. 1990). The district court estimated that the New York Boys distributed an average of two kilograms of cocaine per week over the three-year life of the conspiracy. This estimate was based primarily upon general comments by various defendants estimating average volumes of business. These estimates were then corroborated by reports from cooperating co-defendants that particular quantities of cocaine were handled at particular times, controlled buys by government undercover operatives, and evidence indicating the size and scope of the organization itself. ____________________ 5Defendants argue that, due to the critical impact of drug quantity on a defendant's sentence, due process requires proof of such quantities by clear and convincing evidence, rather than a mere preponderance. This argument was not raised below and, in any event, is foreclosed by circuit precedent. See, e.g. United States v. Lowden, 955 F.2d 128, _________ ______________ ______ 130 (1st Cir. 1992). See also McMillan v. Pennsylvania, 477 ________ ________ ____________ U.S. 79, 91-93 (1986) (holding that a "preponderance standard satisfies due process" at sentencing). -25- -25- Thus, Dawkins testified at trial to a conversation he had with Steven Wadlington on November 6, 1990. Dawkins asked Wadlington how much cocaine the New York Boys sold per week, to which Wadlington replied: "[i]n a slow week, we sell two and a half kilos. In a fast week, four kilos. . . . We do this a long time."6 A second estimate was made by Ansur Adams, a gang member who was allegedly responsible for processing the cocaine. Adams testified that in August and September of 1990 (the year in which he was involved in the conspiracy), the Whiting organization sold between two and three kilograms of cocaine per week. Adams also testified that Jon James, one of the organization's alleged supervisors, told him that the New York Boys "used to move five ki's [sic] a week before [Adams] came." These broad estimates were consistent with reports of quantities handled by various gang members. For example, Tony Samuels testified that the organization sold an average of ten $40 bags and seven $60 bags of cocaine in a 12-hour shift. There was testimony that a $60 bag contained approximately 1.5 grams of cocaine; accordingly, Samuels' ____________________ 6Defendants complain that much of Dawkins' testimony was hearsay. The guidelines provide, however, that "[a]t sentencing, the district court may consider `relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'" United States v. Valencia-Lucena, _____________ _______________ 988 F.2d 228, 232 (1st Cir. 1993) (quoting U.S.S.G. 6A1.3(a)). -26- -26- testimony indicates sales of roughly 410 grams per shift and up to 5.74 kilograms per week. Rochelle Burden testified that each apartment used as a base of sales operations was able to sell a pack of twenty $60 bags every two hours, which supports a figure of 360 grams of cocaine a day and approximately 2.52 kilograms per week per apartment (several apartments were in use at any given time). Wayne Ruff testified that, when running money during a typical shift, he generally delivered the proceeds of five packs of $60 bags to his supervisor; at 30 grams per pack, this figure translates into 300 grams per day or 2.1 kilograms per week. The government notes, moreover, that it is unlikely that Ruff was the only runner. In magnitude these estimates are generally in accord with one another (the only divergent testimony--from Lonnie Avant--suggested an even larger average figure). The estimates are also buttressed by testimony about the organization's impressive scope: there was evidence that it employed at least eight different women as couriers who sometimes made multiple trips per week, carrying anywhere between 125 grams and one kilogram each trip, that selling activities were conducted 24 hours per day, seven days a week, that eleven different apartments were used to sell or store cocaine, and that 50 to 100 different people -27- -27- participated in distribution activities over the course of the conspiracy. Defendants assert that the information upon which the court relied was inherently unreliable for various reasons-- principally that much of it came from cooperating co- defendants who admitted they would lie in order to advance their own interests, and that the statements made to undercover operatives could be construed as exaggerated "puffing." The district court, however, has wide discretion in determining what evidence is sufficiently reliable to use at sentencing, see Tardiff, 969 F.2d at 1287, and we will not ___ _______ disturb the court's finding that the government's witnesses were credible. Brewster, 1 F.3d at 54. Further, the ________ estimates were largely consistent and, as we explain below, the district court's ultimate finding was quite conservative. Defendants' more serious contention is that the evidence produced by the government and relied upon by the sentencing court focused mainly upon the last year of conspiracy. It is inherently speculative, defendants argue, to derive from this evidence estimates of the total amount of cocaine handled by the conspiracy over its three-year existence. We agree that special care may be needed where evidence of quantities in one period is extrapolated to fill gaps in evidence as to other periods. But while the organization's sales here varied over time, there was at least some evidence for -28- -28- earlier periods and the court's conservative estimate left a fair margin of safety. First, some of the evidence here did deal with periods prior to 1990, the last year of the conspiracy. Adams reported that, according to Jon James, the organization distributed five kilograms of cocaine per week prior to 1990. Much of the corroborating anecdotal testimony came from gang members--Burden, Ruff, Avant, and Michael Wilson--who joined the conspiracy in 1987 or 1988. Their evidence, already summarized, was not limited to the final year of the conspiracy. Second, following our directive to "err on the side of caution," Sklar, 920 F.2d at 113, the district court held the _____ organization accountable for two kilograms of cocaine per week over the life of the conspiracy--still an impressive sum but less than Wadlington told Dawkins the New York Boys sold in a "slow week" in 1990 and less than half what James reported selling prior to that year. Moreover, because of the breadth of the relevant sentencing categories, we need only find that the evidence supported a 1.5 kilogram per week figure in order to uphold all of the sentences in this case.7 United States v. Bradley, 917 F.2d 601, 604 (1st ______________ _______ ____________________ 7This is so of Dixon, who was involved for approximately 104 weeks and was sentenced at level 38, which has a 150 kilogram threshold. U.S.S.G. 2D1.1(c)(3). In the case of Whiting, Carmichael, Wadlington and Pledger, one kilogram per week would be adequate for their respective sentencing -29- -29- Cir. 1990). All of the general estimates in the record, as well as the corroborating testimony as to amounts handled at particular times, refer to quantities well in excess of one kilogram per week. III. In addition to the arguments raised jointly by the trial defendants, each of the seven defendants who have appealed in this case has advanced one or more claims of error unique to his individual case. Although we have dealt with most of these contentions in the unpublished portion of this opinion, a few are of sufficient general interest to warrant discussion here. A. Darryl Whiting ______________ Whiting, the ringleader of the "New York Boys" organization, was convicted on one count of engaging in a continuing criminal enterprise, on 21 counts of cocaine distribution, and on one count of money laundering. At the time of his indictment, Whiting was serving a state prison sentence in Massachusetts. His presence at his federal trial was secured through use of the IAD, which permits a state with charges outstanding against a prisoner of another state ____________________ thresholds. Id. at 2D1.1(c)(3), (4)-(5). Because the ___ first-trial defendants were all sentenced in October of 1991, we apply the 1990 version of the guidelines. Isabel v. ______ United States, 980 F.2d 60, 62 (1st Cir. 1992). Although _____________ Bowie was sentenced later and was subject to the 1991 guidelines, the relevant provisions were not altered in the later edition. -30- -30- to take custody of that prisoner for the time necessary for trial.8 His principal argument on appeal is that delays in bringing him to trial violated his rights under the IAD. The IAD requires that where the detainer process is initiated by the receiving state rather than the prisoner, trial must begin within 120 days of the prisoner's arrival in the receiving state. IAD art. IV(c). There are two exceptions to this rule. Article VI provides that the IAD's speedy trial provisions will be tolled "whenever and for as long as the prisoner is unable to stand trial." IAD art. VI(a). In addition, Article IV(c) allows that "for good cause shown in open court, . . . the court . . . may grant any necessary or reasonable continuance." The parties appear to agree that in this case the IAD's speedy trial clock began to run on December 21, 1990, when Whiting made his initial appearance in federal court, and for purposes of this case we adopt this starting point. At a second hearing on December 27, Whiting (now accompanied by counsel) refused to waive his rights under the IAD. On April 3, 1991, shortly before the 120 day period was to expire, the ____________________ 8The IAD is the Interstate Agreement on Detainers, 18 U.S.C. App. II. The federal jurisdiction of the United States is considered to be another "state" for IAD purposes. IAD art. II. Because the IAD is a congressionally-sanctioned compact within the Compact Clause, U.S. Const. Art. I, 10, cl. 3, its construction is exclusively a matter of federal law. Carchman v. Nash, 473 U.S. 716, 719 (1985); Cuyler v. ________ ____ ______ Adams, 449 U.S. 433, 438-42 (1981). _____ -31- -31- government moved for a continuance as well as a finding that the IAD had been tolled by Whiting's filing of various pre- trial motions. After a hearing, the district court accepted the government's tolling argument and found that the speedy trial period would not expire until June 12, 1991, at the earliest. In the alternative, the court found that there was good cause for a continuance. On June 13, 1991, Whiting moved for dismissal of the federal indictment for violation of his rights under the IAD. The district court orally denied this motion on the first day of trial--June 17, 1991--finding that an additional pretrial motion filed by Whiting had tolled the IAD clock for another 34 days. Whiting now appeals from the trial court's denial of his motion to dismiss. We affirm the district court and hold that (1) the IAD clock was stopped and (2) in any event there was good cause for a continuance. 1. The courts of appeals are divided as to the proper construction of the IAD's Article VI tolling provision. Whiting urges us to follow the Fifth and Sixth Circuits, which have construed that provision narrowly and held that the phrase "unable to stand trial" refers only to physical or mental incapacity. See Birdwell v. Skeen, 983 F.2d 1332, ___ ________ _____ 1340-41 (5th Cir. 1993); Stroble v. Anderson, 587 F.2d 830, _______ ________ 838 (6th Cir. 1978), cert. denied, 440 U.S. 940 (1979). We _____________ are precluded from adopting the narrow reading advocated by -32- -32- Whiting by our own prior decisions in United States v. _____________ Walker, 924 F.2d 1 (1st Cir. 1991), and United States v. ______ ______________ Taylor, 861 F.2d 316 (1st Cir. 1988). These decisions, ______ consistent with the predominant view among circuits, held generally that "a defendant waives the 120-day limitation during the time it takes to resolve matters raised by him." Taylor, 861 F.2d at 321 (citation omitted).9 Taylor held ______ ______ out the possibility that the time involved in disposing of a motion might not all be excluded where the defendant timely advised the district court that he or she claimed the protection of the IAD and the district court then took more ___ time than was necessary to resolve the motion. In this case, Whiting did formally invoke the IAD's protection at his second hearing, but the district court also found that Whiting and his counsel made a "tactical decision" thereafter to ignore the issue. In all events Whiting offers no specifics that would lead us to conclude, in this extremely complex and burdensome case, that the district court was slothful in acting on defense motions. Further, based on the rationale of Taylor ______ ____________________ 9The Second, Fourth, Seventh, and Ninth Circuits are in accord. United States v. Scheer, 729 F.2d 164, 168 (2d Cir. _____________ ______ 1984); United States v. Hines, 717 F.2d 1481, 1486-87 (4th ______________ _____ Cir. 1983), cert. denied, 467 U.S. 1214, 1219 (1984); United ____________ ______ States v. Nesbitt, 852 F.2d 1502, 1516 (7th Cir. 1988), cert. ______ _______ _____ denied, 488 U.S. 1015 (1989); United States v. Johnson, 953 ______ ______________ _______ F.2d 1167, 1172 (9th Cir.), cert. denied, 113 S. Ct. 226 ____________ (1992). -33- -33- we hold that the time excluded includes time explicitly granted to Whiting for the preparation of pretrial motions. See Nesbitt, 852 F.2d at 1514 (so holding under the Speedy ___ _______ Trial Act). Finally, we reject Whiting's fall-back position that time spent on non-dispositive motions (here, for discovery and exculpatory evidence) should be treated differently than dispositive motions; both types are likely to delay trial and both should be treated the same under Taylor.10 ______ 2. Alternatively, we find that there was good cause in this case for a continuance under Article IV(c) of the IAD. We have held that a continuance granted under the Speedy Trial Act--a statute that is, if anything, more restrictive of ad hoc continuances--will be reversed only for an abuse of ______ discretion. United States v. Pringle, 751 F.2d 419, 429 (1st _____________ _______ Cir. 1984). In the present case, the district court rested its finding of good cause on three primary grounds: the "inherent complexity of this case, [and] the existence of co- defendants and their pending motions," and the fact that some of Whiting's co-defendants remained at large. These reasons are ones that are recognized as bases for continuance in the Speedy Trial Act. See 18 U.S.C. ____________________ 10Neither Taylor nor Walker concerned motions that were ______ ______ formally dispositive, nor does the distinction urged comport with the statutory criterion ("unable to stand trial") that is construed in Taylor and Walker. ______ ______ -34- -34- 3161(h)(7) (joinder with codefendant whose time has not run), 3161(h)(8)(B)(ii) (complexity; number of defendants). Here, the court was confronted with a case initially embracing over 50 defendants--some still at large--and a range of different charges and issues. To move Whiting's case (and that of five co-defendants) from the assumed starting point to trial in just under six months was no mean feat. Further, even if we followed the Fifth and Sixth Circuit approach and held that Whiting's pretrial motions did not automatically toll the running of the time period, we would hardly ignore them in deciding whether a continuance of about 58 days was reasonable. Here, Whiting did file various pretrial motions, as did other of the first-trial co- defendants; and, as noted, there is no showing that the district court unreasonably delayed in acting upon them. Whatever the limitations on delaying a trial, Whiting's case does not even arguably test them. B. Steven Wadlington _________________ Wadlington was an employee of the Crown Social Hall, a club owned by Whiting that operated as a community center and, the government alleged, a center of drug distribution and money laundering activities. At trial, the government alleged that Wadlington's primary role was to provide security for the organization. Wadlington was convicted of one count of conspiracy to distribute cocaine, one -35- -35- substantive distribution count, and one count of possession of an unregistered firearm. His primary argument on appeal is a challenge to his firearms conviction. Wadlington was charged under 26 U.S.C. 5861(d), which makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." This offense requires not only proof of possession and nonregistration, but also proof that the weapon in question is a "firearm" under the statute. The statutory definition of "firearm" under 26 U.S.C. 5845 is somewhat narrower than that term's commonly understood meaning, see United States v. De Bartolo, ___ _____________ __________ 482 F.2d 312 (1st Cir. 1973), and as Wadlington was accused of possessing an unregistered shotgun, the statute required proof that the shotgun in question had a barrel length of less than 18 inches, or an overall length of less than 24 inches, and could fire (or could be restored to fire) shotgun shells. 26 U.S.C. 5845(c), (d). The trial court's charge to the jury on the firearms count, however, omitted this element. The court instructed the jury as follows: Steven Wadlington . . . [is] indicted for conspiracy and three counts of distribution. And Count 32, possession of an unregistered firearm. That is this sawed off shotgun, and it doesn't matter who you are or what otherwise you are doing, it is a violation of the law to possess such an item unless it has been duly registered as described by the witness, and there is evidence that this firearm [has] not been so registered. So the government doesn't have to prove he is a felon, a user, -36- -36- or anything else, he could be a college president or an archbishop, but he must not possess that firearm. At no time did the court define "firearm" or instruct the jury that it was their responsibility to determine that the shotgun in question was one having a barrel length of less than 18 inches or an overall length of less than 24 inches and either operable or capable of being made operable.11 On appeal, the government concedes--as it must--that it was error to omit the applicable definition of "firearm," and submit the issue to the jury. Wadlington failed to object to the district judge's jury instruction at trial and accordingly, we review only for "plain error." Fed. R. Crim. P. 30, 52(b). The Supreme Court has recently glossed the latter rule by stating that there must be an error, it must be "clear" or "obvious," and it must affect "substantial rights." United States v. Olano, 113 S. Ct. 1770, 1777-78 _____________ _____ (1993). If these criteria are met, the court of appeal "has authority to order correction, but is not required to do so," id. at 1778, and should exercise its remedial discretion only ___ "in those circumstances in which a miscarriage of justice would otherwise result," or where the error "seriously ____________________ 11We focus upon the length and operability, as the parties do in the briefs, because there is repeated reference in the testimony to the weapon as a "shotgun," the weapon was actually shown to the jury, and there is virtually no dispute that it was in fact a shotgun. For this reason, the district court's reference to "this sawed off shotgun"--which might in other circumstances look like a court determination of the issue--is patently harmless. -37- -37- affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 1779 (internal quotations ___ omitted). Although it is easy to see how the district judge could have overlooked a relatively minor and undisputed element in this massive case, we have little difficulty in concluding that the error in omitting a statutory element--the definition of the weapon--of the offense was "clear" or "obvious." Whether that error affected Wadlington's "substantial rights" is a more difficult question. Under Olano, "in most cases it [the error] must have been _____ prejudicial: It must have affected the outcome of the District Court proceedings." Id. at 1778. Further, in a ___ plain error context, "the defendant rather than the Government . . . bears the burden of persuasion with respect to prejudice." Id. ___ If the test of prejudice that applies in this case is whether the jury on this record would have come to the same result under a proper instruction, we think that it is clear that the jury would readily have convicted. Starting with the issue of length, there was testimony that the shotgun had originally been a long-barrelled weapon and that a member of the organization had sawed off portions of both the barrel and stock. Dawkins testified that when he bought the weapon from the organization for $850, it was "sawed off." Finally, -38- -38- a government firearms expert testified at trial that "based upon measurement" of the exhibit, it was a weapon that cannot be possessed without being registered. As to capacity of the weapon to fire or to be made operable, the evidence is a trifle thinner: the government showed that the organization had troubled to cut down the weapon, that the gun had then been possessed by two members of the organization involved in security, and that it had then been sold to Dawkins--a continuing customer of the organization--for $850. Although we question the government's suggestion that its firearms expert was implicitly testifying as to operability, the other evidence very strongly suggests that the shotgun was regarded as a functioning weapon by those with reason to know, and defense counsel never contested operability. All this may not be enough. One might, or might not, read recent Supreme Court decisions to mean that where an incorrect instruction is given, it may not be adequate for the government to show that the record evidence assured that a reasonable jury under proper instructions would have found the disputed element in favor of the government; rather, it may be the law that the jury must in fact have made this finding despite the erroneous instruction.12 Such a ____________________ 12See, e.g., Sullivan v. Louisiana, 113 S. Ct. 2078, ___ ____ ________ _________ 2081-82 (1993); Yates v. Evatt, 111 S. Ct. 1884, 1893-94 _____ _____ (1991); Carella v. California, 491 U.S. 263, 269-71 (1989) _______ __________ -39- -39- showing would be difficult to make in this case (since there was no instruction on length or operability); but whether it is necessary is unclear. The question need not be answered here. Even if we assume in this case that the error did "affect substantial rights," we do not think that this error caused a "miscarriage of justice" or "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 113 S. Ct. at 1778-79. The undisputed _____ evidence showed that this was a sawed off shotgun treated by all as a working weapon. There is thus no risk that the omission of the length and operability elements resulted in the conviction of an innocent man. Cf. Singleton v. United ___ _________ ______ States, No. 92-1647, 1994 WL 242519 (1st Cir. June 10, 1994). ______ Further, there is no indication that defense counsel ever sought to litigate or dispute the length or operability of the weapon. Although a not guilty plea puts the government to its proof on all elements (and so it is error not to instruct on all), in practice defendants often choose to fight on their strongest grounds and let others go by default. Finally, counsel's failure to argue the issues in summation or to object to the patent omission in the charge implies that the issues in question were not thought worth ____________________ (Scalia, J., concurring in the judgment). Compare Pope v. _______ ____ Illinois, 481 U.S. 497, 503 (1987). ________ -40- -40- contesting; and to reverse on this ground would enhance the opportunities for "sandbagging" the district judge. Taking all of these considerations together, we decline under Olano's fourth and discretionary prong to "notice" this _____ "forfeited error." Olano, 113 S. Ct. at 1778. _____ C. Kenneth Bartlett ________________ Bartlett, who was alleged to have served as a security worker and enforcer in the Whiting organization, was in the second group of defendants that went to trial on November 19, 1991. On the sixth day of trial, Bartlett pled guilty to one charge of conspiracy to distribute cocaine. Based on the quantity of cocaine involved in the conspiracy, the district court determined a guideline range for the offense of 262 to 327 months and, on recommendation of the government, sentenced Bartlett to the guideline minimum of 262 months with a caveat that this sentence run consecutively to two state sentences for second degree murder which Bartlett was already serving. Bartlett's argument on appeal is that the guidelines required that his federal sentence run concurrently with his state sentences. Since he failed to object to the consecutive sentence at the time, our review is limited to plain error. We agree that under the Olano test already _____ discussed, Bartlett must be resentenced. Because we are satisfied that the requisites for plain error review are -41- -41- present, we do not reach Bartlett's contention--raised for the first time on appeal--that his trial counsel's failure to object to the consecutive sentence violated the Sixth Amendment.13 In this case, after the district court determined the guideline range for the conspiracy charge, it then considered whether to make the federal sentence consecutive or concurrent to the state sentences. The court found that although Bartlett had been allowed to plead guilty to second degree murder, the conduct underlying both convictions would have supported convictions for first degree murder. Concluding that under Massachusetts law Bartlett would be eligible for parole in 16 years and would probably not be held past that date, the court concluded the federal sentence should run consecutively rather than concurrently. The governing statute confers broad authority on the district court to determine whether a sentence is consecutive or concurrent. See 18 U.S.C. 3553(a), 3584(a), (b). That ___ discretion, however, is confined by guideline provisions that govern this choice where sentence is imposed on a defendant who is "subject to an undischarged term of imprisonment." ____________________ 13Normally, the reasons for a counsel's action are pertinent and a Sixth Amendment claim cannot usually be determined in the first instance by an appellate court. United States v. Sanchez, 917 F.2d 607, 613 (1st Cir. 1990), ______________ _______ cert. denied, 499 U.S. 977 (1991). ____________ -42- -42- U.S.S.G. 5G1.3.14 See United States v. Flowers, 995 F.2d ___ _____________ _______ 315, 316-17 (1st Cir. 1993). The guideline applicable here provides that--with two exceptions not now relevant15--"the sentence for the instant offense shall be imposed to run consecutively to the prior unexpired term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense." U.S.S.G. 5G1.3(c). The commentary then provides that to the extent practicable the court should determine the "reasonable incremental punishment" by determining a sentence "that results in a combined sentence that approximates the total punishment that would have been imposed under 5G1.2 (Sentencing on Multiple Counts of Conviction) had all of the offenses been federal offenses for which sentences were being imposed at the same time." U.S.S.G. 5G1.3, comment. (n.4). Section 5G1.2, so far as pertinent here, directs the court to (1) determine the total punishment for multiple counts in ____________________ 14Bartlett was sentenced on March 11, 1992, and we accordingly apply the 1991 version of the guidelines. 15The first exception requires a consecutive sentence in certain instances (e.g., where the second offense was ____ committed while the defendant was actually serving his first sentence) and the second exception requires concurrent sentences where the undischarged term of imprisonment resulted from an offense or offenses "that have been fully taken into account" in determining the offense level for the instant offense. Id. 5G1.3(a), (b). Here, the district ___ court did not consider the murders in setting either the offense level or the criminal history category for the drug conspiracy offense. -43- -43- accordance with the guideline grouping rules and (2) then make the sentences for the multiple counts run consecutively "only to the extent necessary to produce a combined sentence equal to the total punishment" determined under the grouping rules. U.S.S.G. 5G1.2(d). See generally United States v. _____________ _____________ Hernandez-Coplin, No. 92-2228, slip. op. at 17-19 (1st Cir. ________________ March 31, 1994). Section 5G1.2(c) provides that the sentences on all counts shall run concurrently if the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment. Bartlett urges that because his state sentences were for life imprisonment, those sentences were automatically sufficient to satisfy subsection (c). We believe that this guideline refers to the real or effective sentence--not to a nominal one. After all, one of the primary goals of the federal guidelines is "honesty in sentencing," whereby "the sentence the judge gives is the sentence the offender will serve." Stephen Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 4 (1988). Bartlett ________________ does not here dispute the finding that the state sentence was effectively one for 16 years. Accordingly, had the district court followed the tortuous path prescribed by the guidelines, it would have determined the approximate "total punishment" as if Bartlett -44- -44- was being sentenced on both state murder charges and the federal drug conspiracy charge at the same time in federal court. The grouping rules forbid treating murders as closely related counts with each other or other crimes, U.S.S.G. 3D1.2, and the second-degree murders each carry a base offense level of 33. U.S.S.G. 2A1.2(a). Although the government points to the district court's finding that the underlying conduct supported convictions for first-degree murder, a sentencing court under the guidelines must determine the applicable guideline "by looking to the charge of which the offender was convicted." United States v. ______________ Blanco, 888 F.2d 907, 910 (1st Cir. 1989). ______ Under the "combined offense level" formula, combining these three offense levels--36 for the federal drug conspiracy and 33 each for the two murders--produces a total offense level of 39. U.S.S.G. 3D1.4(a).16 A base offense level of 39, combined with Bartlett's criminal history category of four, yields a guideline range of 360 months to life. See U.S.S.G. Ch. 5 Pt. A (Sentencing Table). ___ In exercising its discretion, the district court could have chosen any figure within this range as the appropriate total ____________________ 16This formula is intricate but mechanical. One starts with the highest offense level (here 36) and increases it by a number of levels based on a table of "units." Here, the number of units was three--one for the drug conspiracy and one each for the murders--and three units is equal under the table to an increase of three levels. U.S.S.G. 3D1.4. -45- -45- punishment for the drug conspiracy and two second-degree murder convictions. Then, given its estimate that the murder convictions represented 192 months (12 times 16 years), it should have imposed a sentence for the drug conspiracy and had it run consecutively "only to the extent necessary" to make the resulting total period of incarceration equal to the total punishment that would have been imposed had all three crimes been sentenced at the same time. U.S.S.G. 5G1.2. While one gulps at using the term "plain" error in the face of this morass of rules, the district court's approach stands the guideline process on its head. Here, instead of calculating the proper total punishment for all three crimes and then making the actual federal sentence consecutive to the extent needed to produce a comparable outcome, the district court computed a sentence for the drug offense alone and then made a single yes-or-no choice between a wholly concurrent and a wholly consecutive sentence. This is a fundamental departure from the structure imposed by the guidelines. We also have no hesitation in concluding that the error probably affected the sentence. Although the district court might (as a matter of mathematics) have arrived in a total punishment identical to that prescribed--namely, an effective estimated sentence of 454 months (192 months for the state offenses plus 262 months for the federal offense)--the odds -46- -46- of this happening seem to us remote. Here the binary choice- -either to make the sentence consecutive or concurrent--is quite likely to have constrained the district court's choice, and (as it proved) not to the defendant's advantage. The Supreme Court has said that even if plain error is shown to have affected the outcome, the reviewing court retains constrained discretion whether or not to reverse. See Olano, 113 S. Ct. at 1778-79. In this case, we think ___ _____ that that discretion should be exercised in favor of a remand for resentencing, fully recognizing that the defendant may not in the end profit from this effort. Our reason is not that this error "affects the fairness, integrity or public reputation of judicial proceedings." Rather, in this case we think it is very likely that the resentencing could produce a different and more favorable sentence.17 If so, the situation corresponds mutatis mutandis to one in which a _________________ forfeited error may have caused the conviction of an innocent person, the other rubric under which a plain and prejudicial error should be noticed on appeal. Olano, 113 S. Ct. at _____ 1779. We add that the burden in resentencing is light. CONCLUSION __________ ____________________ 17If the district court had desired to give a longer sentence, it could easily have chosen a federal term greater than the guideline minimum. Thus, if the district court did feel constrained by the binary choice, it was in the direction of imposing a sentence greater than it would have preferred. -47- -47- The convictions and sentences of Darryl Whiting, Sean Dixon, Renaldo Pledger, Edwin Carmichael, Steven Wadlington and William Bowie are affirmed. The sentence of Kenneth ________ Bartlett is vacated and the matter is remanded for _______ ________ resentencing. -48- -48-